390 So.2d 213 (1980)
S. E. HORNSBY & SONS SAND & GRAVEL COMPANY, INC., Plaintiff-Appellant,
v.
CHECKMATE READY MIX CONCRETE, INC., Defendant-Appellee.
No. 7767.
Court of Appeal of Louisiana, Third Circuit.
September 11, 1980.
Rehearing Denied December 1, 1980.
*214 W. Hugh Sibley and William M. Quin, Kentwood, for plaintiff-defendant in reconvention appellant.
Cline, Miller, Richard & Miller, Rayne Barry J. Heinen, Rayne, for defendant-plaintiff in reconvention appellee.
Before FORET, STOKER, and LABORDE, JJ.
STOKER, Judge.
This litigation began as a suit on an open account brought by S. E. Hornsby & Sons Sand & Gravel Company, Inc., (Hornsby) against Checkmate Ready Mix Concrete, Inc., (Checkmate). The total demand consisted of several increments totaling $13,187.09. The defendant answered admitting plaintiff sold it sand and gravel but generally denying all other allegations. Checkmate coupled its answer with a reconventional demand for damages based on allegations that, in delivering sand and gravel to Checkmate over a period of time, Hornsby had short loaded trucks belonging to the defendant or engaged through independent contractors. The defendant-reconvenor demanded $77,893.00 to cover materials it claims it was billed for but which it never received, and to cover the cost of trucking materials not received, maintenance, wages paid, and fuel expended.
*215 The trial court took the case under advisement and handed down written reasons for judgment. In the written reasons the trial court made findings entirely in favor of the defendant-reconvenor and made a total award to Checkmate of $48,232.74. No mention is made in the reasons for judgment or in the judgment itself of the open account claim of the plaintiff. Since the judgment awarded only $35,055.65, we assume that the trial court applied plaintiff's demand as a credit or set off.
Our appreciation of the facts of this case varies to some extent with those made by the trial judge. However, in essence the issue in the case is whether or not the trial court properly accepted the mode of proof adopted by the reconvenor to establish the shortage which is claimed.

FACTS
Plaintiff Hornsby filed a suit on December 8, 1976. The following demands were made:
$6,584.79 with interest from Aug. 30, 1976 until paid,
3,995.37 with interest from Sept. 30, 1976 until paid,
2,100.17 with interest from Oct. 30, 1976 until paid,
506.76 with interest from Nov. 30, 1976 until paid.
The interest demanded in each case was 10% per annum. An attorney's fee in the amount of 25% was demanded on all sums due in the aggregate of principal and interest.
Checkmate admitted making purchases in its answer and stipulated that it was billed for the above indicated amounts (Tr. 4 and 5) but denied that the amounts were due because it contends it was short loaded. Counsel for Checkmate stated: "We reserve the right, in other words, to reduce the bill by the shortages that we can show."
No written contract existed between Hornsby and Checkmate. However, it is quite clear that a verbal contract was made between Foster Ross representing Checkmate and Stanley E. Hornsby representing Hornsby in which sand and gravel would be delivered to Checkmate at the Hornsby pit in Greensburg, Louisiana, by loading trucks of Checkmate at that point. It is quite clear that the sales were to be on a volume basis rather than upon a weight basis. In proving its alleged shortages, Checkmate introduced no direct evidence. Its evidence consisted entirely of computations based upon its own records and further based upon standard or presumed standard weights of sand and gravel as recognized in the sand and gravel and ready mix concrete industries. Checkmate did do some random weight testing for approximately thirty days toward the end of business relations with Hornsby.
Under the contract Checkmate's trucks made all deliveries and they were loaded at Hornsby's pit in St. Helena Parish. The materials delivered at Hornsby's location in St. Helena Parish were then transported to Checkmate's plant in Rayne, Louisiana. Loading was done primarily by employees of Hornsby. However, Checkmate's employees and independent contractors loaded their own trucks on special occasions when Hornsby employees were not present, principally at night and on weekends. Loading by Checkmate employees was engaged in to some degree but this fact does not affect the case. There was no proof that these drivers were guilty of short loading. Those who did load their own trucks on occasion testified that they followed Hornsby's instructions in loading.
The following facts and conclusions are stated by the trial court in its reasons for judgment:
"Sometimes in late 1976 defendant, Checkmate, became suspicious that they were not receiving the quantity of sand and gravel that they were being billed for and began having their trucks weighed at scales approximately ten (10) miles from where the sand and gravel was picked up at plaintiff's plant. Additionally, the trucks were later weighed at the Breaux Bridge weigh scales on Interstate 10 before returning to defendant's plant in Rayne, Louisiana. Calculating the *216 weight of a cubic yard of gravel and a cubic yard of sand defendant was able to ascertain that shortages were in fact occurring.
"The defendant, Checkmate, introduced evidence of experts in concrete who testified as to the weights of sand and gravel which were per cubic yard of sand, 2,850 pounds and for a cubic yard of gravel, 2,700 pounds. They further testified that variations would occur because of gradation, moisture content and other factors such as sand blowing off during transit. Calculations were then made based upon these figures as to the quantity of concrete made and it was testified as to the weight of gravel and concrete which was necessary to constitute a cubic yard of concrete and these amounts are .69 cubic yards of gravel and .47 cubic yards of sand are necessary in the manufacture of one (1) cubic yard of concrete.
"The Court is impressed by the testimony of defendant's witnesses as to the manner in which the shortages were ascertained and accordingly, the Court does find that in fact in the years 1975 and 1976, defendants were shorted certain quantities of sand and gravel.
"As previously testified .69 yards of gravel and .47 yards of sand are necessary in the manufacture of each cubic yard of concrete. By converting the weight of sand and gravel to cubic yards a figure then can be obtained showing the cubic yards of sand and gravel actually sold by plaintiff to defendant. It is also necessary that a beginning and ending inventory of stock be taken to determine the actual quantities delivered. Experts further testified that a 4% variance could be allowed for blowing sand and a 1% variance for gravel."
The trial court found that shortages did occur in 1975 and 1976. It made what is considered appropriate awards after making certain adjustments which reflected among several factors the beginning and ending inventories. The trial court found that the value of the total net shortage for the two years for gravel was $8,703.19 and that amount was awarded. The value of the net shortage found and awarded for sand was $5,073.73. The sum of $34,455.82 was awarded as expenses "for trucking sand and gravel not obtained because of shortages previously shown." The total award mentioned in the court's reasons for judgment was $48,232.74. (Tr. 47).
The formal judgment stated the award to be $35,055.65. (Tr. 52). The trial court evidently recognized the plaintiff's claim for $13,187.09. By reducing the award to Checkmate by that amount as a credit or set off, the result would be $35,045.65.[1]

VALIDITY OF THE PROOF OF SHORT LOADING
We find no manifest error in the trial court's finding accepting weights for cubic measures of sand and gravel. The record fully supports the trial court's findings that the standard weight of a cubic yard of sand may be considered to be 2,850 pounds and that the standard weight of a cubic yard of gravel may be considered to be 2,700 pounds. However, in our opinion standard weights of these two commodities are not relevant to a resolution of this case.
A meeting occurred in 1974 in Greensburg, Louisiana, in St. Helena Parish, at the location of Hornsby's business. Present at the meeting were Foster Ross, Stanley E. Hornsby, and James McClendon. (Tr. 120-129, 139-141 and 153-156). At that time Foster Ross owned a 50% interest in Checkmate and was its manager. (Tr. 123). Stanley E. Hornsby represented the plaintiff and defendant-in-reconvention, Hornsby. James McClendon was an independent contractor used by Checkmate to haul sand and gravel to Checkmate's ready mix plant in Rayne, Louisiana. Hornsby agreed to furnish sand at $1.50 per cubic yard, concrete gravel at $2.00 per cubic yard and road gravel at $2.50 per cubic yard. See stipulation at transcript page 2. The terms of the discussion were entirely on a volume *217 or quantity basis. There was never any allusion to weight as a measure. (Tr. 127). In fact, the evidence establishes selling by volume rather than by weight was standard in the sand and gravel business at that time and continued to be so through at least the year 1976. (Tr. 157-158).
In the initial discussion, Hornsby explained his method of measuring the loads delivered. The method employed seems to have been an accepted method. Hornsby used a front end loader which had a 3½ cubic yard bucket. Checkmate apparently ordered in 18 and 20 cubic yard loads. In the presence of Ross and McClendon, Stanley E. Hornsby loaded McClendon's truck to demonstrate how it would be done. Ross himself explained in his testimony that Hornsby filled McClendon's trailer which measured out at 20 cubic yards and testified that Hornsby stated "That's the way I am going to load your truck." (Tr. 120). It was understood that scales would not be involved. (Tr. 120).
The testimony of all the witnesses established that the bucket on the front end loader, referred to as a three yard bucket, had a capacity of 3½ cubic yards. To fill an 18 yard order, 5½ to 5¾ buckets were dumped into a truck. To fill a 20 yard order, 6 buckets were dumped into a truck. Hornsby's witnesses all testified that the buyer was to be given the benefit of the doubt. For example, in filling an order for 20 cubic yards of sand or gravel, 6 buckets of material would actually result in giving the customer closer to 21 cubic yards than 20. (3.5 cubic yards per bucket × 6 buckets = 21 cubic yards.) Foster Ross explained that at the time the contract was made with Hornsby in 1974 the method of determining the volume of a truck or trailer bed was to use a tape and measure the length, width, and depth. Then the length was multiplied by the width and this result was multiplied by the length and then divided by 27. (Tr. 125).
Until the present suit was brought no complaint was ever made to Hornsby by Checkmate relative to shortages. Foster Ross stated he was fully satisfied with deliveries although he entertained some suspicion of possible shortages at the time he left Checkmate around September 1975. (Tr. 130). He gave instructions that a checking system be instituted on a random basis. Nothing of this sort was done, however, until a year later. In parts of October and November of 1976 a check was run. At that time, a 30-day check was run on selected trucks by which trucks loaded at Hornsby's pit were weighed at a nearby competitor's scales and then were weighed again at the Louisiana State weighing station at Breaux Bridge, Louisiana. These checks convinced Checkmate's personnel that its company was being short loaded. Nevertheless, no complaint was made although Checkmate then apparently began purchasing its material from other suppliers.
It is apparent that Checkmate's suspicions that it was being short loaded were heightened by its random test in October-November, 1976. It then undertook an elaborate assemblage of data and made the calculations described in the trial court's reasons for judgment. In summary, its calculations indicated that the quantity of materials used in products manufactured by Checkmate was far less than the quantity of materials supposedly delivered to them over a long period of time. However, Checkmate's calculations are based on assumed weights for cubic yards of material. Moreover, Checkmate's conclusions are not derived from data as to actual amounts of material used. The method involved working backwards from the known amount of products produced and assuming quantities of materials from the proportions of materials which ought to go into the finished product. The results of these calculations from the research of Checkmate's records may well justify that company in believing it has been short loaded so as to warrant it in discontinuing business relations with Hornsby. However, we are of the opinion that this method of determining the alleged shortages is legally insufficient.

CREDIBILITY EVALUATION
In its findings the trial court made no specific credibility evaluations with respect *218 to the testimony of any witness. It is clear that the truckers working for Checkmate, either as independent contractors or employees driving Checkmate trucks, frequently loaded their own trucks. For the reasons given above we regard this matter as having no significance. Actually, there is no conflict in the testimony on this particular issue of fact. (See especially the testimony of James McClendon.) Checkmate adduced testimony from drivers and other personnel to establish that there had been no losses of sand or gravel from theft, overturning of trucks, wastage or other means. Checkmate's evidence was to the effect that it operated on a concrete pad and all materials were dumped on the pad by the trucks and all the material was consumed in making ready mix concrete. However, it is significant that the Checkmate truckers were allowed to dump their loads and no inspection was routinely made to check the amount of material contained in the arriving trucks.
As a result of Checkmate's procedures, its only means of establishing shortages was by the involved procedure described above. Inasmuch as no credibility evaluations are involved, the issue in this case, as earlier observed, is simply whether Checkmate's after the fact evaluations from its own records and calculations based on assumed standard weights of sand and gravel suffice to establish its claim of having been short loaded over a two year time period.

DETERMINATIVE FACTORS
In reaching our decision we are impressed by certain facts brought out in evidence.
1. Simple visual inspection of a loaded truck will disclose whether it is significantly short loaded. Witnesses for both sides stated that with very little experience a driver or other person in the ready mix concrete business can look at a truck and tell if it is short several yards. (See for example Tr. 128, 185-186).
2. The Checkmate drivers knew the precise procedure for loading either an 18 yard load or a 20 yard load. They did so themselves. They could check by counting the number of buckets which the front end loader deposited in the truck. (See for example Tr. 200-202). Since loading was on a volume basis, this was the simplest way of checking a load and could be supplemented by visual inspection after loading. Any doubt could be resolved by using the tape measure and applying the formula. (Tr. 125).
3. Contrary to the procedure followed at Checkmate other purchasers of sand and gravel materials followed a checking procedure designed to catch significant shortages. Checkmate made no checks or inspections. (Tr. 116-117). At other plants, the procedure was for someone at the plant to visually check the trucks as they came in. (Tr. 157-158). In cases where a truck arrived short loaded, the seller was notified of the shortage without delay, or as one witness put it, the buyer "cut the load". (Tr. 160). There were scales available at Checkmate's plant, but incoming loads were never checked. (Tr. 114).
4. At no time prior to suit did Checkmate ever make a complaint of shortages to Hornsby.
While we consider the points listed above as very significant, we regard the most important fact to be that the parties contracted on a volume or quantity basis. The unit measurement was by volume and not weight. Scales were not even in use at the pits at the time. At the time of the contract the parties were very specific in agreeing to a volume basis. It was even agreed that 5½ to 5¾ loads from the bucket on Hornsby's front end loader would equal 18 cubic yards and 6 bucket loads would equal 20 cubic yards.
We do not believe defendant-reconvenor's shift to the weight method, involving records only, may be validly resorted to in the contest in this case to prove the shortages it claims. Irrespective of Checkmate's denial of other sources of loss and Checkmate's claim of accuracy as to the quantity of materials used in its production, we regard Checkmate's method to be speculative and conjectural in its probative effect in a court of law.
*219 For the foregoing reasons we reverse the trial court's judgment in favor of defendant-reconvenor.

PLAINTIFF'S DEMANDS ON OPEN ACCOUNT
In our opinion the plaintiff proved its principal demand. In addition to the principal sum of $13,187.09, plaintiff demanded interest at the rate of 10% per annum if payment was not made within thirty days and 25% attorney's fees if placed in the hands of attorneys for collection. Stanley E. Hornsby maintains that he informed Foster Ross in their initial contact when the verbal agreement was made that interest on overdue accounts would be charged and that attorney's fees of 25% would be charged if suit was necessary. (Tr. 141). However, this is denied by Ross and is not corroborated by McClendon. Hence, from a testimonial standpoint, we regard the matter of interest and attorney's fees as not having been proven.
All of the delivery tickets or invoices containing a place for the signature of the receiver of the materials (the drivers primarily) had the following printed on them: "10% per annum interest after 30 days and 25% attorney fees if placed in the hands of attorney for collection." Although all the tickets or invoices bore the statement, such does not entitle plaintiff to conventional interest or attorney fees. Payment of such must be specifically agreed to. Succession of Drake, 359 So.2d 249 (La.App. 2nd Cir. 1978); American Supply Co. v. Petrolane Off. Const. Serv., 294 So.2d 240 (La.App. 1st Cir. 1974), writ refused 296 So.2d 839 (La. 1974); Pooler Building Materials, Inc. v. Hogan, 244 So.2d 62 (La.App. 1st Cir. 1971) and Holzer Sheet Metal Works v. Reynolds & Marshall, 43 So.2d 169 (La.App.Orl.1949). Plaintiff is entitled to legal interest from date of judicial demand until paid. LSA-C.C. arts. 1938 and 1940. Holzer Sheet Metal Works v. Reynolds & Marshall, supra.

DECREE
For the foregoing reasons the judgment of the trial court is reversed and set aside. It is now therefore ordered, adjudged, and decreed that there be judgment herein in favor of plaintiff-appellant, S. E. Hornsby & Sons Sand & Gravel Company, Inc., and against defendant-appellee, Checkmate Ready Mix Concrete, Inc., in the full sum of $13,187.09, together with legal interest from date of judicial demand until paid and for all costs of this proceeding including the cost of this appeal and costs of the proceeding in the trial court.
REVERSED AND RENDERED.
NOTES
[1] We assume the $10 difference in the two figures is an inadvertent error but that the trial court did mean to credit Hornsby with $13,187.09.